IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| VERONICA MUHAMMAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-09-968-D |
| | ) | |
| COMANCHE NATION CASINO, | ) | |
| | ) | |
| Defendant. | ) | |

**O R D E R**

Before the Court is Defendant Comanche Nation Casino's Motion to Dismiss [Doc. No. 4], filed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Plaintiff Veronica Muhammad has responded in opposition to the Motion, which is fully briefed and at issue.[1]

**Procedural History**

Plaintiff commenced this action in the District Court of Comanche County, Oklahoma, to recover damages for personal injuries suffered in a slip-and-fall accident on Defendant's business premises. Her state court pleading alleged the casino was "owned and maintained by the Comanche Nation," which "is a tribal entity registered in the State of Oklahoma under the Compact so that this [state] court has jurisdiction over the persons and subject matter." *See* Notice of Removal, Ex. 1 [Doc. No. 1-1], Petition, ¶¶ 1-2. The referenced compact is the Tribal Gaming Compact Between the Comanche Nation and the State of Oklahoma. *See id.*, Ex. 3 [Doc. No. 1-3]. Plaintiff based her jurisdictional allegations on recent decisions of the Oklahoma Supreme Court holding that state

---

[1] Defendant has filed a reply brief, and both parties have filed supplemental briefs. Also, Defendant recently filed a Notice of Supplemental Authority regarding a judgment favorable to its position obtained by the Choctaw Nation of Oklahoma and the Chickasaw Nation. *See Choctaw Nation v. Oklahoma*, Case No. CIV-10-50-W, 2010 WL 2802159 (W.D. Okla. June 22, 2010) (to be published).

district courts have jurisdiction over such tort actions. *See Cossey v. Cherokee Nation Enter., LLC*, 212 P.3d 447 (Okla. 2009); *see also Griffith v. Choctaw Casino*, 230 P.3d 488 (Okla. 2009); *Dye v. Choctaw Casino*, 230 P.3d 507 (Okla. 2009).

Defendant removed the case to federal court pursuant to 28 U.S.C. § 1441 based on the existence of federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff challenged Defendant's jurisdictional allegations by filing a motion to remand, which was denied by Order of September 28, 2010 [Doc. No. 25]. The Court found that Defendant had satisfied its burden to demonstrate federal subject matter jurisdiction based on the existence of a substantial question of federal law embedded in the state-law claim asserted in Plaintiff's pleading. Specifically, Defendant persuaded the Court that Plaintiff's action necessarily involved an interpretation of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§2701-21 – specifically, the permissible scope of a tribal-state gaming compact under § 2710(d)(3)(C) – and the proper interpretation of the Compact under federal law.

**Defendant's Motion**

By the instant Motion, Defendant seeks a determination of these issues as a matter of law under Rule 12(b)(1) and Rule 12(b)(6). Defendant argues in support of its Motion that Oklahoma courts lack jurisdiction over Plaintiff's tort action and that jurisdiction lies exclusively in the tribal courts of the Comanche Nation. *See* Def.'s Motion [Doc. 4] at 3-9. This assertion, if true, might require a dismissal or stay of the case to permit the exhaustion of tribal court remedies. *See National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 857 (1985) (federal jurisdiction exists to decide "the federal question whether a tribal court has exceeded the lawful limits of its jurisdiction,

2

[but] exhaustion is required before such a claim may be entertained by a federal court").[2] The Court need not, however, stay this case to permit tribal courts to determine their jurisdiction under IGRA and the Compact because these questions are matters of federal law over which tribal courts lack jurisdiction. *See Nevada v. Hicks*, 533 U.S. 353, 367-68 (2001) (holding in an action under 42 U.S.C. § 1983 that tribal courts are not courts of "general jurisdiction" that can decide a federal claim or issue without an express federal grant of such authority).[3]

Tribal sovereign immunity is a matter of subject matter jurisdiction that may be decided under Rule 12(b)(1). *See Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007). In arguing its Motion, Defendant concedes "[t]here is no question that the [Comanche] Nation has waived immunity from tort actions in the Compact." *See* Def.'s Reply Br. [Doc. No. 12] at 5. However, Defendant requests a determination that the scope of its waiver does not permit Plaintiff to pursue a state-court action. Defendant contends the waiver in the Compact authorizes only actions in "a court of competent jurisdiction" and that this phrase does not include state courts. *See id*. Because Defendant's Motion turns on the scope of its waiver, this question may properly be resolved under Rule 12(b)(1). *See Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1293 (10th Cir. 2008).

Defendant also seeks a dismissal under Rule 12 (b)(6) based on Plaintiff's alleged failure to state a claim upon which relief can be granted. Defendant argues in support of this aspect of its Motion that Plaintiff's tort claim fails for lack of exhaustion of tribal administrative remedies. This

---

[2] The rule of tribal-court exhaustion is a matter of comity and not jurisdiction. *See Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997); *see also Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 n.8 (1987). Thus, viewed in this way, Defendant's Motion would not be governed by Rule 12(b)(1) but, instead, would be treated as a request for dismissal on abstention grounds. *See Harvey ex rel. Chavez v. Star*, No. 95-2283, 1996 WL 511586, *1 (10th Cir. Sept. 10, 1996) (affirming dismissal but modifying order to reflect abstention as proper basis).

[3] Unpublished opinion cited pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1(A).

contention plainly raises a question of tribal law that goes to the merits of Plaintiff's tort claim. It should be decided, if at all, by tribal courts and is inappropriate for decision by this Court in the first instance. *See Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1507 (10th Cir. 1997) (federal courts should abstain on comity grounds from deciding questions of tribal law). Thus, the Court declines to reach this contention and, instead, limits its consideration of Defendant's Motion to federal issues involving the interpretation of IGRA and the Compact.[4]

## Standard of Decision

"Motions to dismiss for lack of subject matter jurisdiction 'generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based.'" *City Of Albuquerque v. United States Dep't of Interior*, 379 F. 3d 901, 906 (10th Cir. 2004) (quoting *Ruiz v. McDonnell*, 299 F. 3d 1173, 1180 (10th Cir.2002)). If the motion challenges only the sufficiency of the plaintiff's jurisdictional allegations, a district court must confine itself to the pleadings and accept the allegations as true; additional evidentiary materials may not be considered. *See Holt v. United States*, 46 F. 3d 1000, 1002 (10th Cir. 1995). Where, however, the motion challenges the underlying factual basis for subject matter jurisdiction, the court's decision is not constrained by the pleadings. *Paper, Allied-Industrial, Chemical & Energy Workers Int'l Union v. Continental Carbon Co.*, 428 F. 3d 1285, 1292-93 (10th Cir. 2005) (citing *Holt,* 46 F. 3d at 1002-03). In these circumstances, "the court must look beyond the complaint and has wide discretion to allow

---

[4] Defendant also contends that Plaintiff has failed to state a claim for relief because she expressly agreed to exclusive tribal-court jurisdiction when she submitted an administrative tort claim, in compliance with tribal law, stating such consent. Defendant argues in support of this contention that the agreement is a forum selection clause and should be upheld. A motion to dismiss based on a forum selection clause is governed by Rule 12(b)(3). *See K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 314 F.3d 494, 497 (10th Cir. 2002). Further, the validity of Plaintiff's consent, which she denies, would also be a matter for decision by tribal courts in the first instance.

4

documentary and even testimonial evidence." *Id*. The court must convert such a motion to one for summary judgment "'when resolution of the jurisdictional question is intertwined with the merits of the case.'" *See id*. (quoting *Holt*, 46 F.3d at 1003). The issues are considered to be intertwined for this purpose where "resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir.2000); *see Continental Carbon*, 428 F.3d at 1293.

In this case, the Court finds that Defendant's Motion challenges the factual basis for subject matter jurisdiction, and thus, the Court need not accept Plaintiff's allegations as true nor confine its review to the pleadings. The Court further finds that the jurisdictional issues are not intertwined with the merits of Plaintiff's tort claim. Therefore, Defendant's Motion may properly be decided under Rule 12(b)(1) by considering matters outside Plaintiff's state-court petition.

## Discussion

The parties agree that the State of Oklahoma can only acquire civil-adjudicatory jurisdiction over an enterprise of a federally recognized Indian tribe involved in gaming activities on Indian lands if (a) authorized by Congress under the provisions of IGRA <u>and</u> (b) conferred by the terms of a tribal-state gaming compact and, specifically, a provision for the waiver of tribal sovereign immunity.

**A.     Interpretation of IGRA**

Plaintiff's action concerns personal injuries allegedly caused by Defendant's negligent maintenance of "the premises of the Comanche Nation Casino which is owned and maintained by the Comanche Nation." *See* Petition [Doc. No. 1-1], ¶ 1. There is no question the casino is located on "Indian lands" as defined by IGRA. *See* 25 U.S.C. § 2703(4). The issue of whether the State of Oklahoma can validly adjudicate a tort claim against Defendant for conduct occurring on Indian

5

lands depends, in part, on whether IGRA authorizes states to acquire such jurisdiction as part of a tribal-state gaming compact.

A gaming compact is a creation of IGRA, which determines the compact's effectiveness and permissible scope. *See Seminole Tribe v. Florida*, 517 U.S. 44, 49 (1996); 25 U.S.C. § 2710(d)(3); *see also Cabazon Band of Missions Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997); *Gaming Corp. v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996).[5] IGRA expressly authorizes negotiations between states and tribes concerning Class III gaming activity as follows:[6]

> (C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to –
>
> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such [Class III gaming] activity;
>
> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
>
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
>
> (v) remedies for breach of contract;
>
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

---

[5] To be valid and effective, a gaming compact must have been entered into by the state in compliance with state law, and it must be approved by the Secretary of the Interior; it takes effect upon publication of the Secretary's approval in the Federal Register. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997); 25 U.S.C. § 2710(d)(3)(B).

[6] IGRA establishes three categories of gaming activity; Class III encompasses gambling activities such as "slot machines, casino games, banking card games, dog racing, and lotteries." *See Seminole Tribe*, 517 U.S. at 48; *see also* 25 U.S.C. § 2703(7)(B), (8). Only Class III gaming requires a tribal-state compact. *See* 25 U.S.C. § 2710(d)(1).

> (vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).

In Defendant's view, IGRA's delineation of permissible topics of compact negotiations – by providing that compacts "may include" these topics – also limits the scope of authorized negotiations to these specific subjects areas. The Court accepts, without deciding, the correctness of this view, which has been adopted by one federal appellate court. *See Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019, 1028-29 (9th Cir. 2010) ("IGRA limits permissible subjects of negotiation in order to ensure that tribal-state compacts cover only those topics that are related to gaming and are consistent with IGRA's stated purposes.") (footnotes omitted), *petition for cert. filed* 79 U.S.L.W. 3141 (U.S. Sept. 3, 2010) (No.10-330). Nevertheless, subsections (i) and (ii) of Section 2710(d)(3)(C) expressly authorize gaming compacts to specify which sovereign's civil laws will apply – if the laws "are directly related to, and necessary for, the licensing or regulation" of gaming activity – and which sovereign will have jurisdiction to enforce these laws. Defendant's contention that IGRA does not permit states and tribes to negotiate a choice of laws and a selection of forums for tort claims necessarily depends on the proposition that civil tort laws are not "directly related to, and necessary for" regulation of gaming activity. The Court respectfully disagrees.

IGRA represents a balance struck by Congress among the interests of tribal governments, the states, and the federal government in gaming activities on Indian lands. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1548, 15055 (10th Cir. 1997). For Class III gaming, this balance requires that two sovereign governments – a state and a tribe – enter into a valid compact and that they obtain federal approval of their agreement. The legislative history demonstrates that Congress devised the

compacting process as a means for states and tribes to resolve a fundamental disagreement over which sovereign would have regulatory authority over Class III gaming conducted on Indian lands within state boundaries. *See* S. Rep. No. 100-446, at 13 (1988), *reprinted in* 1998 U.S.C.C.A.N. 3071, 3083; Roland J. Santoni, *The Indian Gaming Regulatory Act: How Did We Get Here? Where Are We Going?*, 26 Creighton L. Rev. 387, 403, 407 (1993); *see also Kelly*, 104 F.3d at 1554 ("While preservation of tribal sovereignty was clearly of great concern to Congress, respect for state interests relating to Class III gaming was also of great concern.").

The legislative history does not support Defendant's position that Congress intended to impose narrow restrictions on the scope of regulatory authority open to negotiation. The Court acknowledges that an express purpose of IGRA is to provide a statutory basis "for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operators and players." *See* 25 U.S.C. §§ 2701(4), 2702(2). However, broader concerns existed, beyond promoting federal Indian policy and preventing organized crime and corruption. As explained by the Senate Select Committee on Indian Affairs, which recommended passage of the final bill:

> In the Committee's view, both State and tribal governments have significant governmental interests in the conduct of class III gaming. . . . <u>A tribe's governmental interests include</u> raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, <u>promoting public safety as well as law and order on tribal lands</u>, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders. <u>A State's governmental interests</u> with respect to class III gaming on Indian lands <u>include the interplay of such gaming with the State's public</u>

8

<u>policy, safety, law and other interests,</u> as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens.

*See* S. Rep. 100-446, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 3083 (emphasis added).

Civil tort laws fall well within the realm of public safety, policy, and order. Personal injury laws serve to expose safety hazards and protect the public, as well as to provide an incentive for preventing injuries and allow for compensation of injured parties. Congress was well aware that many casino patrons would be non-Indian state citizens or tourists, and the personal safety of these visitors to Indian lands would be a logical concern of both states and tribes. Given this backdrop, the Court is unconvinced that Congress intended to preclude negotiations concerning such important matters as which sovereign's civil laws and courts would be responsible for the welfare of participants in gaming activities. Congress, as well as compacting parties, could reasonably view the regulation of tortious conduct occurring in the course of commercial gaming and casino operations as directly related to and necessary for the regulation of gaming activities.[7] For these reasons, the Court is unwilling to read into IGRA a barrier to negotiations that is not compelled by the language of the statute.

Defendant argues in support of its position that "the federal agency responsible for approving compacts" has not read Section 2710(d)(3)(C) as authorizing compacting parties to negotiate civil-adjudicatory jurisdiction for tort claims. *See* Def.'s Reply Br. [Doc. No. 12] at 2. This argument is based on a letter dated January 28, 2000, from the director of the Office of Indian Gaming Management of the Bureau of Indian Affairs to the chairman of a legislative committee in New Mexico in response to a request for comments by the Department of Interior regarding a proposed

---

[7] The Court's view is consistent with the conclusion reached by the New Mexico Supreme Court in *Doe v. Santa Clara Pueblo*, 154 P.3d 644, 655 (N.M. 2007): "Congress could rationally conclude that tribes ought not to be foreclosed from negotiating [jurisdictional provisions regarding personal injury suits] perceived to be in their own interest, and as 'directly related to, and necessary for, the licensing and regulation' of gaming."

tribal-state gaming compact. This opinion letter expressed the agency's view that IGRA's authorization to compact regarding civil jurisdiction "would not extend to a patron's tort claim because it is an area that is not directly related to, and necessary for, the licensing and regulation of a class III gaming activity." *See id.*, Ex. 1 [Doc No. 12-2] at 2.

The law is well established, however, that an agency's informal interpretation of a federal statute, such as an opinion letter, is not entitled to deference. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Unlike an agency regulation or formal administrative interpretation of a statute, informal opinion letters are "entitled to respect . . . but only to the extent that those interpretations have the power to persuade." *Id.* (internal quotation omitted); *see also New Mexico Cattle Growers Ass'n v. United States Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001) ("we simply ask if the agency's interpretation is well reasoned and has the power to persuade") (internal quotation omitted). In this case, the opinion letter contains only a conclusory statement unsupported by any analysis or citation of authority; it rests solely on the language of the statute. Further, the letter is plainly inconsistent with the agency's approval in 2004 of the compact at issue in this case, which expressly addresses tort claims. The agency declined to approve one negotiated provision as beyond the scope of topics listed in Section 2710(d)(3) and thus "not an appropriate term for inclusion within this compact," but found the remaining provisions to be consistent with IGRA and other federal laws. *See* Def.'s Reply Br., Ex. 2 [Doc. No. 12-3] at 3. Thus, the Court thus finds the 2000 opinion letter to have no persuasive force.

Finally, Defendant argues that any ambiguity in the language of IGRA should be construed according to the principle of federal Indian law that "statutes enacted for the benefit of an Indian tribe must be liberally construed with ambiguous provisions resolved in favor of the tribe." *See* Def.'s Mot. Dismiss [Doc. No. 4] at 13 (citing *Bryan v. Itsaca County*, 416 U.S. 373, 392 (1976)).

Defendant fails to explain how adopting an interpretation of IGRA that would prohibit Indian tribes from negotiating and compacting with states regarding the allocation of civil-adjudicatory authority over tort claims is favorable to the tribes. To the contrary, the Court finds that placing a restrictive limit on the phrase "directly related to, and necessary for" regulation of gaming would be inconsistent with the congressional purpose of promoting strong tribal governments. Permitting tribes to compact for the allocation of civil-adjudicatory jurisdiction over tort claims related to gaming operations enables a tribe, as here, to develop its own administrative and civil law systems and to provide for the welfare of casino patrons coming onto its lands. Thus, the Court is also unpersuaded by this argument.

In summary, the Court concludes that IGRA does not prohibit a state and a tribe from negotiating an allocation of civil-adjudicatory authority over tort claims related to gaming operations. The Court finds that the civil disputes about which the State of Oklahoma and the Comanche Nation negotiated – tort claims and prize disputes – are sufficiently related to and necessary for the regulation of gaming activities that jurisdiction over such disputes is a legitimate subject of tribal-state negotiations and, where an accord can be reached, a Class III gaming compact.

**B.     Interpretation of the Compact**

A tribal-state gaming compact is similar to a "congressionally sanctioned interstate compact the interpretation of which presents a question of federal law." *Cuyler v. Adams,* 449 U.S. 433, 442 (1981); *see also Texas v. New Mexico*, 462 U.S. 554, 564 (1983); *Tarrant Regional Water Dist. v. Sevenoaks*, 545 F.3d 906, 909 n.1 (10th Cir. 2008). "A compact is a form of contract." *Kelly*, 104 F.3d at 1558 (citing *Texas v. New Mexico*, 482 U.S. 124, 128 (1987)). "It remains a legal document that must be construed and applied in accordance with its terms." *See Texas*, 482 U.S. at 128.

The Compact between the Comanche Nation and the State of Oklahoma took effect in 2005. *See* 70 Fed. Reg. 3942 (Jan. 27, 2005).[8] The Compact addresses two types of potential civil disputes between the tribal enterprise conducting gaming operations and casino patrons – tort claims and prize claims. Concerning tort claims, the Compact provides in Part 6 as follows:

> A. Tort Claims. <u>The enterprise[9] shall ensure that patrons of a facility are afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury or property damage against the enterprise arising out of incidents occurring at a facility</u>, hereinafter "tort claim", as follows:
>
> 1. During the term of this Compact, the enterprise shall maintain public liability insurance for the express purpose of covering and satisfying tort claims. The insurance shall have liability limits of not less than Two Hundred Fifty Thousand Dollars ($250,000.00) for any one person and Two Million Dollars ($2,000,000.00) for any one occurrence for personal injury, and One Million Dollars ($1,000,000.00) for any one occurrence for property damage, hereinafter the "limit of liability", or the corresponding limits under the Governmental Tort Claims Act, whichever is greater. No tort claim shall be paid, or be the subject of any award, in excess of the limit of liability;
>
> 2. <u>The tribe consents to suit on a limited basis with respect to tort claims subject to the limitations set forth in this subsection and subsection C of this Part</u>. No consents to suit with respect to tort claims, or as to any other claims against the tribe shall be deemed to have been made under this Compact, except as provided in subsections B and C of this Part;
>
> 3. The enterprise's insurance policy shall include an endorsement providing that the insurer may not invoke tribal sovereign immunity in connection with any claim made within the limit of liability if the claim complies with the limited consent provisions of subsection C of this Part. Copies of all such insurance policies shall be forwarded to the [State Compliance Agency or "SCA"];

---

[8] The Compact's validity under state law was predetermined by the enactment of legislation, the State-Tribal Gaming Act, Okla. Stat. tit. 3A, §§ 261-82, which was approved by a referendum election in November, 2004. This enactment codified the terms of a model compact, and authorizes a particular tribal-state gaming compact to become effective under state law without a state signatory. *See id*. §§ 280, 281 (Part 16).

[9] As used in the Compact, "'[e]nterprise' means the tribe or the tribal agency or section of tribal management with direct responsibility for the conduct of covered games, the tribal business enterprise that conducts covered games, or a person, corporation or other entity that has entered into a management contract with the tribe to conduct covered games, in accordance with IGRA." *See* Notice of Removal, Ex. 3 [Doc. No. 1-3] at 6 (Part 3(13)).

    4. Any patron having a tort claim shall file a written tort claim notice by delivery to the enterprise or the [Tribal Compliance Agency or "TCA"]. The date the tort claim notice is filed with the enterprise or the TCA shall be deemed the official date of filing the tort claim notice. The tort claim notice shall be filed within one (1) year of the date of the event which allegedly caused the claimed loss. Failure to file the tort claim notice during such period of time shall forever bar such tort claim; provided that a tort claim notice filed with the enterprise or the TCA more than ninety (90) days, but within one (1) year, after the event shall be deemed to be timely filed, but any judgment thereon shall be reduced by ten percent (10%).

    \*  \*  \*

    8.  The enterprise shall promptly review, investigate, and make a determination regarding the tort claim. Any portion of a tort claim which is unresolved shall be deemed denied if the enterprise fails to notify the claimant in writing of its approval within ninety (90) days of the filing date, unless the parties by written agreement extend the date by which a denial shall be deemed issued if no other action is taken. . . .

    9. <u>A judicial proceeding for any cause arising from a tort claim may be maintained in accordance with and subject to the limitations of subsection C of this Part only if the following requirements have been met</u>:

     a.  the claimant has followed all procedures required by this Part, including, without limitation, the delivery of a valid and timely written tort claim notice to the enterprise,

     b.  the enterprise has denied the tort claim, and

     c.  the claimant has filed the judicial proceeding no later than the one-hundred-eightieth day after denial of the claim by the enterprise; provided, that neither the claimant nor the enterprise may agree to extend the time to commence a judicial proceeding; and

    10. Notices explaining the procedure and time limitations with respect to making a tort claim shall be prominently posted in the facility. Such notices shall explain the method and places for making a tort claim, that this procedure is the exclusive method of making a tort claim, and that claims that do not follow these procedures shall be forever barred. . . .

*See* Notice of Removal, Ex. 3 [Doc. No. 1-3] at 20-24 (emphasis added). The omitted provisions specify the procedures for filing and processing the tort claim notice according to rules and regulations promulgated by the responsible tribal agency, and for obtaining a prompt decision of the

claim by the appropriate tribal authority. *See id.* at 6, 8, 9 (Part 3(13), defining "enterprise"; Part 3(22), defining "rules and regulations"; and Part 3(26), defining "Tribal Compliance Agency").

Part 6(C) states the tribe's "Limited Consent to Suit for Tort Claims and Prize Claims" as follows:

> The tribe consents to suit against the enterprise in a court of competent jurisdiction with respect to a tort claim or prize claim if all requirements of paragraph 9 of subsection A or all requirements of paragraph 11 of subsection B of this Part have been met; provided that such consent shall be subject to the following additional conditions and limitations:
>
> 1. For tort claims, consent to suit is granted only to the extent such claim or any award or judgment rendered thereon does not exceed the limit of liability. Under no circumstances shall any consent to suit be effective as to any award which exceeds such applicable amounts. This consent shall only extend to the patron actually claiming to have been injured. A tort claim shall not be assignable. In the event any assignment of the tort claim is made in violation of this Compact, or any person other than the patron claiming the injury becomes a party to any action hereunder, this consent shall be deemed revoked for all purposes. . . .

*Id.* at 28-29. The Compact also contains provisions regarding compliance, enforcement, and dispute resolution, including any "dispute over the proper interpretation of the terms and conditions of this Compact." *See id.* at 50 (Part 12). The preferred method of dispute resolution is an amicable, voluntary agreement regarding any allegation of noncompliance or issue for interpretation. *See id.* at 50-51 (Part 12(1)). Alternatively, either party may seek arbitration of a dispute according to the rules of the American Arbitration Association, subject to *de novo* review of any arbitration award by a federal district court, and the parties expressly "consent to the jurisdiction of such arbitration forum and court for such limited purposes and no other, and each waives immunity with respect thereto." *See id.* at 51 (Part 12(2)); *see also id.* at 52 (Part 12(3), consenting to suit and waiving immunity for a federal court action regarding an arbitration award). The Compact expressly

provides concerning jurisdiction: "This Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." *See id*. at 37 (Part 9).

The significance of this last provision requires an understanding of federal Indian policy and the legal context into which IGRA introduced tribal-state gaming compacts and negotiations. IGRA rests on a premise that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." *See* 25 U.S.C. § 2701(5). The Supreme Court made this pronouncement the year before IGRA was enacted, and so provided an impetus for IGRA's passage, by holding that the State of California could not regulate tribal bingo operations occurring on Indian lands because such regulation "would impermissibly infringe on tribal government." *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 222 (1987). Consequently, Congress provided in IGRA a "framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities. The mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact." *See* S. Rep. 100-446, at 5-6, *reprinted in* 1988 U.S.C.C.A.N. at 3075; *see also Rincon Band*, 602 F.3d at 1027.[10]

---

[10] Based on the legislative history, the Ninth Circuit concluded that "Congress enacted IGRA to provide a legal framework within which tribes could engage in gaming . . . while setting boundaries to restrain aggression by powerful states." *Rincon Band*, 602 F.3d at 1027.

15

Given this premise, only an affirmative extension of state civil-adjudicatory jurisdiction by a tribal-state gaming compact will be sufficient to have this effect.[11] It is clear that the Compact contains no such affirmative statement. It merely authorizes in Part 6(C) a civil action against the tribal enterprise in "a court of competent jurisdiction." This phrase is undefined and, as shown by the Oklahoma Supreme Court's decisions concerning the model compact, open to interpretation. Contrary to the conclusion reached by state courts, however, this Court finds that the operative phrase cannot refer to state courts because they have no authority over conduct by a tribal entity occurring on tribal land unless such authority is expressly granted to them. Therefore, the lack of any definition of the phrase "court of competent jurisdiction" prevents a reading of the language of the Compact to include state courts.

Other provisions of the Compact bolster this conclusion. Part 6(A) places responsibility for processing and determining a tort claim on tribal authorities, and Part 6(A)(7) plainly contemplates that tort claims will be governed by tribal rules and regulations. Part 5(A) expressly requires the tribe to "promulgate any rules and regulations necessary to implement this Compact, which at a minimum shall expressly include or incorporate by reference . . . the procedural requirements of Part 6 of this Compact." *See* Notice of Removal, Ex. 3 [Doc. No. 1-3] at 12. Presumably, the tribe could have included in its implementing rules and regulations a provision authorizing a state court action by a claimant against the tribal enterprise responsible for gaming operations, but it expressly chose to limit the pursuit of tort claims to an administrative process and tribal court. *See id.*, Ex. 4, Comanche Nation Gaming Commission, Tort Claim Regulations [Doc. No. 1-4], § 104. The tribe's tort claim regulations expressly require any civil action to be brought in tribal court. *See id.* § 401.

---

[11] Even under federal law generally, outside of IGRA, a tribe's waiver of immunity must be "clear." *See C & L Enter., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001) (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)).

The Court finds nothing in the Compact that would prevent the tribe from imposing such a requirement.

Plaintiff concedes that "an Indian tribe is only subject to suit where Congress has authorized the suit or where the tribe has waived immunity." *See* Pl.'s Resp. Br. [Doc. No. 9] at 9 (citing *Kiowa Tribe of Okla. v. Manufacturing Tech, Inc.*, 523 U.S. 751, 756 (1998)). Plaintiff contends, however, that a consent to suit in any court having jurisdiction, without specifying tribal court, is a sufficient waiver to permit a state court of general jurisdiction to hear an action. *See id.* at 12 (citing *C&L Enter., Inc. v. Citizens Band of Potawatomi Indian Tribe of Okla.*, 532 U.S. 411 (2001)). The facts of the cited case are clearly distinguishable. *C & L Enterprises* involved a commercial construction contract that provided for the application of Oklahoma law and contained an arbitration clause that required the resolution of all contract-related disputes by binding arbitration according to rules of the American Arbitration Association. Those rules expressly provided that the arbitration award could be entered in any federal or state court having jurisdiction. Further, Oklahoma's statutes (the applicable law under the contract) specifically provided for jurisdiction to enforce an arbitration agreement in "any court of competent jurisdiction in this state." *See C & L Enter.*, 532 U.S. at 419-20 (quoting Okla. Stat. tit. 15, § 802(B), now Okla. Stat. tit. 12, § 1852(3)). The Supreme Court found this sufficiently clear, under the circumstances, to authorize an enforcement action in Oklahoma state courts.

In contrast, this case does not concern a commercial contract but a tribal-state gaming compact. As explained above, this compact is governed by IGRA and its strong policy of promoting tribal self-government. Nothing in the Compact permits an inference that the tribe intended "a court of competent jurisdiction" to include state courts. Parts 5 and 6 of the Compact specifically provide for the application of tribal rules and regulations to tort claims by casino patrons against the tribal

gaming enterprise, and those regulations limit actions to tribal court. In short, none of the facts on which the Supreme Court relied in *C & L Enterprises* to find a waiver of sovereign immunity for state court actions are present here.

In summary, the Court finds that the Compact does not waive the tribe's sovereign immunity from suit in state court or otherwise permit a state court action against the tribal enterprise to adjudicate Plaintiff's tort claim. Consequently, the Court need not reach additional arguments presented by Defendant.[12] Further, because it appears that the tribe has waived its immunity from tort claims limited solely to an administrative remedy or a civil action in tribal court, the Court finds that Plaintiff's action should be dismissed for lack of jurisdiction.

## Conclusion

The Court finds that Plaintiff's tort action should be dismissed for lack of subject matter jurisdiction.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss [Doc. No. 4] is GRANTED.

IT IS SO ORDERED this 27th day of October, 2010.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

---

[12] In a supplemental brief, Defendant presents a written resolution between the State of Oklahoma and the Comanche Nation stating the parties mutual agreement, pursuant to the dispute resolution provisions in Part 12 of the Compact, concerning the meaning of the phrase "court of competent jurisdiction" in Part 6(C). The resolution is signed by Governor Brad Henry and Chairman Michael Burgess. However, no evidence of Governor Henry's authority to enter into the resolution on behalf of the state is presented. Under state law, the governor is authorized to enter into agreements with tribal governments, but "such agreements shall become effective upon approval by the Joint Committee on State-Tribal Relations." *See* 74 Okla. Stat. tit. 74, § 1221.